## Cleveland, C., C. & St. L. Ry. Co. v. A. L. Patterson.

1. COMMON CARRIERS—*Limitations of Liability by Contract.*—A contract by a shipper, that he will at his own risk feed and water stock while in transit, is valid, and if it appears that a shipment was understood to have been made under such a contract, the fact that the contract was not signed until the transportation was nearly complete will not render the carrier liable for failure to water stock.

Trespass on the Case, for failure of railroad company to water stock. Appeal from the Circuit Court of Vermilion County; the Hon. FERDINAND BOOKWALTER, Judge, presiding. Heard in this court at the May term, 1896. Reversed and remanded. Opinion filed February 25, 1897.

H. M. STEELY, attorney for appellant.

LAWRENCE & LAWRENCE, attorneys for appellee.

MR. JUSTICE WALL DELIVERED THE OPINION OF THE COURT.

The appellee recovered a judgment for $35 against appellant for damages caused, as alleged, by negligence in transporting a car load of hogs.

The hogs were shipped at Ridge Farm Station, on appellant's road, to be transported to Indianapolis. They were placed in a stock car about 5 : 30 P. M., and were immediately taken out by a train going north to Tilton, the terminus of that branch of appellant's road, a distance of some sixteen miles from Ridge Farm.   Here the car was switched by the Wabash Railway Company to the "Y" connecting its road with the Peoria and Eastern Division of appellant's road, and was left there about eight o'clock P. M.   The first freight train east on the P. & E. Division was due at 11 : 30 P. M., but that night it was two hours late, and reached Indianapolis about two hours behind time the next morning.   There was some delay on the part of the Belt road in switching the car to the stock yards, and when it was unloaded five of the hogs were dead.

There is no complaint that the delays referred to caused the shipper to lose anything in the market price, for the hogs were promptly sold at the ruling figures for that day.

The only ground of recovery is that, for want of water, five of the hogs died.

According to the testimony, they had water just before being loaded in the car at Ridge Farm, and when placed on the "Y" at Danville they were apparently in good condition, but when taken into the train on the P. & E. Division they were hot and panting and two were dead.

They were then watered, and were watered again at Crawfordsville.   Whatever negligence there was must have been in not sooner watering at Danville, and it is claimed that as the weather was unusually warm this was necessary. Had the train going east been on time they would have been watered two hours earlier than they were, and perhaps this might have prevented the loss.

There is evidence tending to show that they had been fighting while on the "Y," and this is the more probable,

because the seventy-one head in the car were made up of three or four different lots, and being strange to each other they would be likely to fight while the car was standing on the " Y," especially if they were uncomfortable from heat and thirst.

Assuming that the want of water while so waiting was the efficient cause of the loss, the question is whether appellant should be held responsible therefor.

Appellee was an experienced shipper of such stock; had frequently sent hogs by that train to the Indianapolis market and was familiar with the movement of trains. He also knew that in order to get the lowest rate the shipper was required to sign a certain shipping contract, which exempted the company from the consequence of neglect to feed and water stock during transit. He went away from the station the evening of shipment, without executing the contract, but returned the next morning without solicitation and signed it. At that time the car was still in transit, and he did not then know that anything unusual had occurred. It seems quite clear that both he and the station agent understood the shipment was upon the usual terms as to rates and conditions, and that the delay in signing the contracts was merely because the appellee did not go to the office for that purpose that evening. His action in going there the next morning shows plainly that he understood he was shipping under the contract and in consideration of the reduced rate.

It is not urged that he did not know the conditions of the contract, but merely that it is not effective, because not signed until the transportation was nearly complete.

We think if it was mutually understood that the contract was to be signed and that the shipment was to be thereunder, the mere delay in its execution until the service was partly rendered would make no difference, and therefore the case is to be considered in the same light as though it were actually signed the evening before when the hogs were placed in the car.

As stated, one of the conditions of the contract exempted the carrier from the duty to feed and water, the shipper

assuming to do so at his own risk and expense, and being permitted to go with the stock on the same train without charge for the purpose of watering and caring for them. Had appellee done this he would have discovered the necessity for water while on the " Y," and would presumably have avoided the loss.

It does not appear that the appellant by its servants actually knew that the hogs were suffering for water, and any omission to discover the fact, or to water them, would be within the stated exemption. The contract also exempted the carrier from liability for injury caused by hogs crowding upon one another and the like.

If the contract is to be considered as applicable, it is difficult to see upon what line of reasoning the verdict can be supported. We are of opinion the motion for new trial should have been granted.

The judgment will be reversed and the cause remanded.